161430, an appeal from a decision of the Patent and Trial and Appeal Board arising out of a re-examination. Mr. Morrison, do you want five minutes for rebuttal? If needed, Your Honor. Okay. Proceed. May it please the Court. The PTAB committed a reversible error in this case because the PTAB never really considered one of the key terms in this particular patent, which is the demodulating term that's recited in Claim 1 and what that demodulating term means. And in this particular case, that omission led to a faulty invalidity analysis. What if we were to conclude that based on reading the Board's decision, it is clear to us that the Board and the examiner were thinking of the word demodulate as meaning comparing, comparing the tuned signal against the threshold voltage signal to see if the tuned signal exceeded the threshold voltage signal? So I think that would be an incorrect reading of it because, as we noted in our appeal brief, we have different claim sets. And these different claim sets sometimes use the word demodulate and sometimes use the word compare. And we think that claim differentiation and the specification describes that these two actions are two different actions. Okay, so that's an argument about that demodulate shouldn't mean compare, but that's a different argument than the question of I can't tell what the meaning of demodulate is in the mind of the Board. Just take it that the Board's decision is clear enough that they understood the term demodulate as it's used in your claim to mean comparing two signals. Well, I would fundamentally disagree with that because I think the Board wasn't clear as to what they thought demodulate meant in any way. And, in fact, I think that them being unclear is what led to these inconsistencies between the appeal decision and the rehearing decision where they say what I consider to be inconsistent things. But I understand your question. The question is what if we just interpret and we say demodulate means compare? And I don't believe that's a correct interpretation of the word demodulate, not just because of the claim differentiation issue, but the issue that the PTAB really never came out and said that. They simply said that we agree with the examiner. And what the examiner said was the prior art teaches detecting a signal. But that detecting and then says, okay, so this is demodulation. But there's no explanation of why detecting equals demodulation. I mean, besides the fact that they're two different words, I think one of our new skill in the art would understand that demodulation process is different from merely detecting something. Well, talking about a few different things, but as I understand the board decision is they said, okay, this max 975 reference is talking about how this comparator can detect incoming RF signals. And that is then input into the comparator. And then if it exceeds the threshold voltage signal, that's what kicks up the system from low power mode to high speed mode. And that's how the standby mode operates. So now the next question becomes, okay, is comparing two signals properly meeting the limitation of demodulate? And the answer to that is no. Simply because… Maybe if we gave it a narrow construction, but if we give the most broad meaning to that construction, then why wouldn't demodulate also include detecting the signal? Well, I wouldn't say that demodulate doesn't include detecting the signal. I would say that demodulate includes more than just detecting the signal. That there's other processes that are involved in demodulation, as that word is normally understood by a person of ordinary skill in the art. But it can include detecting the signal. Well, it can include detecting some portion of the signal. But in our particular case, I don't think detection is in the broadest sense. But I don't think in our claim that detecting is part of that. That's your argument that the board found that it did include detecting, that detecting was demodulation. If we've seen the signal… That's correct. But the board found that detecting is equal to demodulation. And our argument is that detecting is not equal to demodulation. Demodulation, if we make an analogy, includes, for example, three steps, A, B, and C. So the mere performance of step A of that process doesn't mean you've disclosed steps B and C. And that's our primary argument here. It's not that the MAX 975 reference doesn't detect something to go into the high-power state. It clearly does detect something and essentially operates as a switch. And our proposed construction of demodulate is that you have to extract a communicated signal from the signal that you receive for it to be a demodulation. But doesn't the patent itself say that the demodulator both demodulates and extracts? It draws a distinction between the two. How can you say one is subsumed within the other? Okay. Demodulator 44 demodulates the received signal 40 and extracts the communicated signal in the form of a square wave or digital bit stream for processing by tag processor 38. No, I think that is what the demodulator does. That is the steps of the demodulation process. So to follow up on Judge O'Malley's point, that sentence in reference to demodulator 44 is using two verbs. One is the verb demodulates, and then there's a separate verb called extracts. And so demodulating and extracting, whatever demodulating is, it sounds like it's a separate independent action from extracting. So therefore, I don't know why, at least the way the term demodulate is being used in this patent, why demodulates necessarily includes extracting information from the modulated signal. Well, I think that that sentence may be inarticulately written there, but I think that what we have to look at is what does demodulate mean to one of ordinary skill in the art? And while it says it demodulates and extracts, I think that one of ordinary skill in the art would understand that demodulation includes both those actions. Shouldn't we also try to figure out what the term comparator means to one of ordinary skill in the art? The claim term says comparator, operable to demodulate. And so comparator, it's discussed, it's disclosed, it's illustrated in your patent. It makes it pretty crystal clear. There's two inputs, the tune signal, the voltage threshold signal, and the comparator is comparing those two signals to issue some kind of digital output. That would be correct, and I'm not quite sure what Your Honor's question is. I guess my point is that the comparator in your patent is comparing two signals. That's what it's doing. It's comparing two signals to extract a signal from those. And then when we look at this patent specification, it talks about how the demodulator demodulates or the comparator demodulates by comparing the tune signal to the threshold voltage signal, i.e. there it's explaining to us how the inventor understands the term demodulates. Right, and I think the point is that, well, what happens technically is that the demodulator receives the signal, and the demodulator compares that signal to the threshold voltage, and this is where the comparison aspect comes into it. And then it outputs a digital output, and that digital output could be a one or a zero, and also that demodulated signal, when it first is demodulated, may not be a completely clean signal. And so the whole purpose of this comparison is to end up with a clean square wave that the processor, which is shown as another component, can then operate on that clean signal. Right, and that's the extraction step, right? No, the extraction step is the processor, I would say, processes the clean signal that's been extracted from the carrier wave by the comparator. Whereas what happens in the prior art is that low power comparator, it merely operates as a switch. It doesn't take that signal, extract any information from it, and send it off to another component to be processed. What it does is it turns on that high power comparator, which is the device that does the demodulation. And so the reason that we focused on claim three in this particular appeal is that I think it's pretty clear, and I believe the director has conceded this point, that the demodulation has to happen with less than four microamps being used by the comparator. And in this particular case, the prior art never demodulates that signal using less than four microamps with the low power mode. It's only the high power mode that does that. But it detects below that level, right? It detects at three microamps. It detects for the purposes of saying, there is a signal there, so I'm going to turn on the high power thing to demodulate that signal. It merely says, is there a signal there or is there not a signal? And in fact, as we describe in the patent, this is really the issue with the prior art. If we decide that detecting the signal is modulation, then you would lose on this particular issue. Well, I suppose if you decide anything in a particular way that I could lose on the issue. But I think the issue is that the record, I think, makes it pretty clear that detecting is not demodulation. And I would point to the prior art in and of itself, right? Because it doesn't say we demodulate with the low power and then we turn on the high power and further demodulate. What it says is we detect and then we turn on the high power comparator to do the demodulation. Which I would say there's no demodulation done by that low power comparator. I think the other issue that I just wanted to bring up briefly is that... You are in your rebuttal if you want to say this. Okay. I will hold off then. May it please the court. I think it would be helpful to start by talking about what demodulation means in the context of the 953 patent. What we have is an RFID tag. I think that's what we are talking about, right? Certainly, Your Honor. But maybe at a higher level. What we have is an incoming analog signal and we want to convert that into a digital bit string. A string of ones and zeros that may represent information. And specifically, the part of the claim that parties have focused on... Incoming signals are typically modulated, right? Correct. And this is very much like... And then you have to demodulate that in order to work with the information that's being carried on that modulated signal. That's correct, Judge Shen. And the patent, the 953 patent, describes a single process by which you do this demodulation. It's in the abstract. It's in the summary of the invention. It's in column 4. It's also in column 7. You have exactly what Your Honor Judge Shen described earlier. You have two inputs. You have the received signal and you have a threshold voltage signal that remains constant. The comparator compares those two and it generates a digital output. So that's either a one or a zero. In the detection mode that counsel is referring to, this is exactly the same process. And I would refer Your Honors to pages 26 and 27 of our brief because counsel... I mean, if you have a comparator and you have a demodulator, why would we assume that they do exactly the same thing? Well, to be clear, Your Honor, the comparator is the structure that performs the demodulation step. And it's important to remember this is an apparatus claim, not a method claim. And the construction below of demodulate, operable to demodulate, was having the capability of demodulating. And that's because this is a structural element in an apparatus claim. And opposing counsel has not identified any structural distinction that would support a difference between the MAX 975 comparator and the comparator that's claimed. Now, the remarkable thing is that the MAX 975 comparator is admitted to be precisely the same comparator that's described in the 953 patent. So there's obviously some belief that it's not exactly the same thing. I mean, they describe it in the patent and say we have to modify it. So they say modify, really what they're doing is configuring. And we pointed out in a footnote in our brief exactly how that configuration is disclosed in the MAX 975 reference. On Appendix 1220, it describes exactly the same configuration. You drive LP high or low to be in the high power mode or the low power mode. And there was some discussion in the reply brief about disabling auto standby mode. That is also disclosed in the MAX 975 reference. But it's also irrelevant because when you're in the low power mode, you don't use auto standby, according to the MAXM reference. That's only when you're in high power mode. But, again, we're talking about a structural limitation. We're talking about exactly the same MAXM 975 comparator. That much is admitted. And that comparator has the capability of comparing two incoming signals, generating a digital output. And that's all that's required. Now, whether you do that once and then kick it into a different mode to perhaps where you're more efficient or you can demodulate faster with a better sampling rate, or whether you do it only once, the structure is the same. The capability is the same. It seems to be that what Access is arguing is that in the MAX 975 reference, it doesn't tell you to stay in the low power mode and keep performing that operation over and over to generate the entire string of ones and zeros. MAX 975 says what you can do is you can kick it into the high power mode. But what is really happening here is that Access took a piece of prior art that was more advanced than what they were seeking and disabled, in the words of the patent, 75% of the functionality and then claimed what was left. It's very much like having a 10-speed bicycle in the prior art and then trying to claim a bicycle that's capable of being ridden only in first gear. That's essentially what's happened in this case. I have a question about this 975 reference, this MAX 975 reference. It discloses three different modes, right? There's the auto standby mode, which the board relied on, we're debating over. But it also separately disclosed the high speed mode and then a low power mode. And I'm just wondering, I mean for me, A1220, the disclosure of the low power mode seems like an even more natural fit for a 102 rejection. So I'm just wondering how come, is there a reason why, am I missing something about that disclosure of the low power mode? No, Your Honor. And in fact, the examiner relied on the low power mode to make the 102B rejection. And that's found in the final rejection at Appendix 673. It was repeated in the examiner answer at Appendix 925 to 926. And it was expressly adopted by the board, if not at Appendix 20, then certainly at Appendix 4 to 5 in the rehearing decision. And specifically, the examiner said that he was not relying on the high power mode, but expressly relying on the low power mode to meet the demodulation. And specifically, that was because the active detection was a demodulation. And then in the context of the toll tag circuit, which is later on in the maximum circuit, there it goes into the high power mode for ongoing demodulation. But that relates to the fact that certain types of signals may require more power. And the claim has none of these limitations. The claim does not require what MAX 975 describes as a 600 kilohertz signal on a 2.4 gigahertz carrier signal or any other limitations on the specific type of incoming radio frequency signal. The claim is, in fact, very broad. I'd also like to address this claim differentiation point that's been made by ACCESS in terms of demodulate versus compare. I'd like to clarify, we're not saying that demodulate just means compare. We're saying the broadest reasonable interpretation of demodulate must mean exactly what's described in the abstract and elsewhere, which is A, comparing the received signal to the threshold voltage signal, and B, generating a digital output. Some of the claims say operable to demodulate based on that comparison. Some of the claims, claim 18, for example, say operable to compare as well as operable to generate the digital output. But in any case, we're talking about the same operation. And critically, that's the same operation that the patent spec itself describes for detecting a signal. And again, this goes back to the chart that we have on pages 26 and 27 of the red brief. If you look at column 7, which reads in connection with figure 4 of the 953 patent, patentee describes how the signal is detected and demodulated, for that matter, and it is precisely the same process. There's absolutely no distinction between them. They certainly use the same underlying hardware. Here, that's the MAX 975. It's admitted prior art. The configuration described in the patent is also disclosed in the prior art. And unless there are any other questions, we would ask that you affirm. Okay, thank you. About two and a half minutes for a rebuttal. So just a couple issues is that what the director has said is that the MAX 975 does not tell you how to demodulate with the low power signal. It tells you that you can detect with the low power and you can then demodulate with the high power. And I think this is exactly the crux of the issue here is that is that detection a demodulation? And we spent a lot of time on this, but I don't know that there's any other issue here beside that point. And we're looking at the prior art here, right? And the prior art is the MAX 975 reference. And there's nothing in the MAX 975 reference that says you can demodulate using the low power op amp. What it says is you can compare, you can detect. But once that happens, it turns on the high power. There's nothing else that happens in the circuit of the MAX 975 reference. It doesn't say you could leave the low power on and keep on demodulating or keep on comparing that signal in the low power. It says once you detect the presence of a signal, you have to go to the high power. It automatically kicks in the high power mode. So the idea that we are just merely making configuration changes to that device is really not correct. We are telling you specifically in column 5 of that patent how to make this MAX 975 component operate within our circuit in the way that we want it to operate. And we made wiring changes, and we described those in detail as to how you make those wiring changes. So it operates the way we say it needs to operate to perform this functionality. Thank you. Thank you. All right. The cases will be submitted.